LEMUEL M. CLAY ET AL., APPELLEES, v. FRANK H. PALMER ET AL., APPELLANTS.

FILED APRIL 30, 1920. No. 20871.

1. **Vendor and Purchaser:** NOTICE OF LEASE. One who purchases land, with knowledge that others are in possession of a portion of it under an agreement of the nature of a mining lease, takes it subject to the rights of the lessees.

2. **Mines and Minerals:** CONTRACT: CONSTRUCTION. The agreement set forth in the opinion, considered in connection with other evidence in the record, *held* to be more than a mere license to extract potash, and to confer upon the lessees the exclusive right to occupy the leased premises and remove potash.

3. ———: LEASE: ABANDONMENT. Evidence examined, and *held*. not to show abandonment by the lessees at the time defendants entered and removed mineral-bearing water from the leased premises.

4. **Partnership:** WRONGFUL ACTS: DISSOLUTION: PARTIES. Where a partner has, in violation of his duty to the partnership, wrongfully

disposed of property in which the partnership has an interest, or wrongfully surrenders partnership rights to third parties with notice of the same, a court of equity may, in a suit by the other partners against the wrongdoers, compel restitution, and, if requested and justified, dissolve the partnership and compel an accounting. In such a suit all parties who have knowingly received such property are proper parties defendant.

5. Trover: MEASURE OF DAMAGES  In this state the rule is, that damages shall only be compensatory, and not punitive; and, where property wrongfully taken has been changed in its nature and can not be identified, the measure of damages is its value immediately after it has been taken and reduced to the possession of the wrongful taker.

APPEAL from the district court for Sheridan county: WILLIAM H. WESTOVER, JUDGE. *Affirmed in part, and reversed in part.*

*Herbert S. Hadley, E. P. Holmes, William V. Hodges, John S. Kirkpatrick, Mitchell & Gantz* and *L. J. Williams,* for appellants.

*Sullivan, Squires & Johnson* and *O. A. Abbott, contra.*

LETTON, J.

This action was brought by two members of a partnership to reform a contract and establish it as a lease, for a specific enforcement of the instrument as reformed, and to enjoin defendants from interfering with possession of the leased premises, for recovery of the property, or its proceeds, for an accounting, and praying for a dissolution of the partnership.

The petition alleges, in substance: Plaintiffs Clay and Irwin are members of a partnership named the Palmer Potash Products Company, each owning a one-third interest, the other one-third interest being owned by the defendants Frank H. Palmer and Emily W. Palmer, his wife.

In February, 1916, Henry J. Ashburger and Gottlieb Ashburger, owners of about 1,240 acres of land in Sheridan county, sold the same to Palmer for $12,400, $200 of

which was paid in cash. The remainder was to be paid on March 1, 1917, when the deed and abstract were to be delivered. Possession was given May 1, 1916. On part of this land there were two lakes, the waters and underlying soil of which contained potash. So far the allegations are undisputed. It is alleged that in June, 1916, Palmer entered into this partnership agreement with Lee Owen, Helmer Haglund, and L. M. Clay for the purpose of producing potash from the waters and deposits of part of the larger lake, known as Ashburger lake. It is alleged, and the evidence in behalf of plaintiff tends to prove, that an oral lease was made by Palmer to the partnership for the term of 20 years to all that part of the lake lying south of a line crossing the lake, which was marked out by the parties at that time, with the right to remove and appropriate all of the potash and other minerals in the lake and underneath the same. The lease further conveyed the right to use sufficient ground near the lake north of this lease for the necessary buildings, tanks, and machinery, and for a right of way across the tract to the line of the Chicago, Burlington & Quincy Railroad, and sufficient other land contiguous to the railroad upon which to erect necessary buildings and side tracks. It was agreed that each of the members of the partnership except Haglund, should contribute and pay in $500 cash, and that the partnership should pay Palmer a royalty of one-eighth of the proceeds of the potash produced. Haglund paid his $500 by transferring to the partnership at that price a certain boiler, engine, and other machinery. Afterwards the parties went to a bank at Alliance and procured an employee of the bank to reduce the agreement to writing. The writing is as follows:

"These articles of agreement, made and entered into this 24th day of June, 1916, by and between Frank H. Palmer, Lee Owen, L. M. Clay and H. H. Haglund, and Mrs. Emily W. Palmer, Witnesseth: That the said parties do hereby form themselves into a partnership. Frank

H. Palmer and Mrs. Emily Palmer to own a one-fourth interest in same, and each of the other three parties to own a one-fourth interest. The firm are to do business under the firm name of the 'Palmer Potash Products Co.' The officers of the company will be as follows till changed by consent of the partnership: Frank H. Palmer, president and general manager, L. M. Clay, vice-president, Mrs. Emily Palmer, treasurer, H. H. Haglund, secretary, and Lee Owen, superintendent.

"In consideration of Frank H. Palmer owning the land on which the deposits are located, which the company intend to work, it is mutually agreed that he shall remain permanently as president and general manager of the company. All funds belonging to the company shall be paid into the hands of the treasurer and disbursed by said officer. It is further mutually agreed that, in case any of the parties hereto shall sell their interest in the company, the other parties hereto shall have the first chance to buy said interest, and in case they do not purchase same, it shall not be sold except to such party or parties as shall be agreeable to the other parties hereto. Each party hereto is placing $500, or $2,000 in all, in the hands of the treasurer, the $500 share of Mr. H. H. Haglund being represented by two boilers and a steam engine, which are on the grounds where the company expect to operate at this time, the balance of the $1,500 being paid in in cash as follows: Frank H. Palmer and Mrs. Emily Palmer $509, Lee Owen $500, L. M. Clay $500.

"In consideration of the lease on the south part of 'the Ashburger lake to this company by Frank H. Palmer, it is hereby agreed to give the said Frank H. Palmer a royalty of one-eighth on all potash obtained by said company, it being agreed that the one-eighth royalty above mentioned shall mean that the said Frank H. Palmer shall receive one-eighth of the proceeds of the money received on all potash sold, after the one-eighth is taken out of the proceeds, the balance shall go to the company;

and no expense of the company shall be deducted from the royalty above mentioned. It is further agreed that, in consideration of the one-eighth royalty above mentioned, the said Frank H. Palmer agrees to lease to the company sufficient grounds for the buildings to be erected in the manufacture of said potash, also a right of way across his land to the Chicago, Burlington & Quincy Railroad, and sufficient lands adjacent to the railroad tracks for the purpose of erecting the necessary side tracks and buildings for the company.

"It is further agreed that the treasurer shall give a bond for $1,500 at this time, and a personal bond is hereby agreed to be satisfactory to the other parties hereto.

"In Witness whereof the parties hereto have hereunto set their hands this 24th day of June, 1916.

"Frank H. Palmer,
"Lee Owen,
"L. M. Clay,
"Helmer Haglund,
"Emily W. Palmer.

"Signed in presence of W. J. Root."

The petition alleges that the writing was defective, in that it did not provide that the partnership should last for 20 years, nor that the lease should be for a 20-year term, and lacked definiteness as to the premises leased.

Afterwards Haglund sold his interest to plaintiff Irwin, and the interest of Owen was purchased by the firm with partnership funds, so that Clay and Irwin now own two-thirds, and Mr. and Mrs. Palmer one-third, of the assets of the partnership. It is alleged that defendant Copsey, with full notice and knowledge of the partnership rights, bought the land from Palmer and executed a lease to the lake to the Nebraska Potash Works Company, a corporation, which also had full knowledge of plaintiffs' rights through its manager, defendant Hulen.

After the execution of the agreement the partners constructed buildings and improvements on the margin of

the lake and began extracting potash. In a somewhat crude manner they extracted about 13 tons of potash before October 1, 1916, but expenses were high, more capital was needed, and dissensions arose between them, so that they ceased the active manufacture of potash about the latter part of September, although Irwin continued to operate until in December, burning his own fuel. Two small houses had been erected on the land, in one of which Irwin and his family resided, and an employee lived in the other, and continued to reside there until after this action was begun, and the boilers, engines, tanks, pans, and other items of personal property still remained *in situ* upon the premises, and it is alleged they are still in possession.

In 1916 efforts were made by the partners to interest others who could provide the necessary capital to make the payment upon the land due on March 1, 1917, and for the successful prosecution of the work. Sometime before March 1, 1917, defendant Copsey, a doctor and banker of Alliance, became interested, visited and took samples of water from the lake, and finally purchased from Palmer all of his interest in the contract from Ashburger. Palmer testified that he told Dr. Copsey that the partnership had a plant at the lake, that the partners were trying "to beat me out of the whole thing   *   *   * and I guessed there would be no more potash made, so far as I was concerned."

The amount due Ashburger was paid, and a deed executed to one Hargarden. Copsey furnished the money. Hargarden soon afterwards conveyed to Copsey. These deeds were recorded on March 5, 1917, and this action was begun in April, 1917. Within a week or two Copsey leased the lake and its deposits to the Nebraska Potash Works Company, hereinafter termed the company. It is admitted that Copsey and the company, by its president, Stevens, and its manager, Hulen, had full knowledge of the written agreement, but they deny knowledge that the lease was for 20 years.

The prayer of the petition is that the contract be reformed, so as to show that the term of the partnership and the term of the lease should each be for 20 years from the date of the written contract, and that, when so reformed, the contract be specifically enforced, that defendants be enjoined from interfering with the use and occupancy of the premises by the partnership, and that the title be confirmed and quieted in said partnership.

Defendants answered, admitting the execution of the written agreement, which it is alleged is the only agreement made between the parties, alleging abandonment of the enterprise by the partnership, denying that Palmer ever leased the lake or any part of it to them, admitting that the defendant company is now constructing a plant and intends to remove potash and other minerals, and prays that defendants' title be quieted. The cause was then removed by defendants to the federal court, and afterwards remanded. During the interval the company sank wells in the lake and began pumping water and extracting potash.

After remand, an amended and supplemental petition was filed, which alleges substantially the same facts as in the original petition, and, in addition, alleges that Palmer is still the owner of the land; that the company has taken out from 12 to 13 tons of potash a day, of the value of $136 a ton; that the partnership is indebted, and the Palmers refuse to pay or contribute to the payment of the debts; that the company has sunk over 400 wells in and about the lake, and are threatening to bring suit to eject the plaintiffs from the premises. The prayer is that the lease of the company be canceled; that it be restrained from operating upon the premises; that the title be quieted in the partnership; that an accounting be taken of the value of the potash extracted, and that this amount, with interest, be paid over to a receiver of the partnership to be appointed by the court; that the partnership be dissolved and its affairs wound up.

The defendants filed answers substantially as before, pleading, in addition, that the agreement between Palmer and the partnership is void under the statute of frauds, and that the defendants were purchasers in good faith. The reply denies abandonment.

The trial court made specific findings of fact in favor of plaintiffs, and, as conclusions of law, found that plaintiffs were entitled to a decree dissolving the partnership, to have a receiver appointed to wind up its affairs, and to enforce the specific performance of the oral lease, and that defendants Hulen, Copsey and the company are each liable to the partnership in the sum of $120,000, with interest from May 1, 1918, as damages sustained caused by the trespass of the company. Judgment and decree were rendered accordingly. Separate motions for a new trial were filed and overruled.

While the evidence is conflicting to some extent, we are fully satisfied that the partnership took possession in June, 1916, and still retained actual and visible possession of the leased premises at the time Palmer sold to Copsey; that Copsey and the other defendants had full knowledge of all the rights claimed by the partnership; that whatever rights they have were acquired with such knowledge, and are subject to the rights of the partnership, whatever they are.

An important question is: What was the nature of the agreement entered into between Palmer and the partnership? Was it merely a parol license, good for one year, or was it a lease for 20 years, void under the statute of frauds, unless partly performed? We are of the opinion that the recitals in the written agreement, "in consideration of the lease on the south part of the Ashburger lake to this company by Frank H. Palmer," etc., and further, "the said Frank H. Palmer agrees to lease to the company sufficient grounds" for buildings and right of way, etc., when considered in connection with the oral testimony, establish the fact that the writing does not contain the entire contract, but that the term of duration of the

partnership and of the lease was 20 years.  We also believe that the taking and holding of possession was sufficient part performance to take the agreement out of the statute of frauds and vest all rights thereunder in the partnership.

The lease was, however, not an unconditional demise of the land and lake, as plaintiffs assert, but partook of the nature of both a lease and a license.  It was a lease of the right to occupy land at and near the lake, and at the railroad, and of a right of way, subject, however, to determination before the end of the term in certain contingencies, such as the exhaustion of the deposits or the total abandonment of the enterprise.  It is to be noted, also, that under the written agreement, when a corporation was formed as contemplated, Palmer, "on account of the ownership of the land," was to remain permanently as president and general manager of the corporation.  This was evidently in Palmer's mind an additional consideration for the lease.

It is clear that Palmer never intended to give, nor the partnership to acquire, an absolute lease to the property.  No rent was stipulated to be paid except as derived from the potash extracted.  In such an instrument it is implied that the refusal or neglect of the lessee to work the deposits, if continued for such a length of time as to indicate that the enterprise was wholly abandoned, would work a forfeiture of the lease. Such agreements, though often called "leases," are not such, strictly speaking.  They convey greater rights in certain respects than an ordinary lease, since they imply and require the removal of part of the corpus of the estate, which otherwise would constitute waste (*Fawn Lake Ranch Co. v. Cumbow,* 102 Neb. 288 ), though in the respect that failure to work the deposits warrants a forfeiture, they are less effective than an ordinary lease.  They may be limited as to time or as to quantity, and are usually known as "mining leases."  3 Lindley Mines (3d ed.) secs. 861, 862, and cases cited.

Defendants argue that the evidence shows an abandonment by the partnership before Copsey purchased. The proper limits of this opinion do not permit a detailed statement of the evidence upon this point. It is sufficient to say that retention of the possession of the dwellings, other structures, and machinery, the continuance of work until in December, 1918, the repeated efforts to enlist capital in the enterprise with Palmer's concurrence and active participation, continuing up to January, 1917, within a few weeks of his sale to Copsey, the filing of the original petition before the company had expended any money upon the south portion of the lake, the refusal to vacate when notice was served by Palmer on the plaintiffs early in March, 1917, with other facts in evidence, are sufficient to convince us that no abandonment had taken place at the time Copsey bought, nor at the time the company obtained its lease and entered upon that part of the lake held by the partnership. We conclude, therefore, that the removal of potash from the south half of the lake was had subject to the rights of the partnership.

Defendants Copsey, Hulen and the company contend that this action cannot be maintined against them, that they are not in privity with the partnership, and cannot be joined with it in such an action.

Palmer occupied a dual relation to the partnership. First, he was the lessor, and it was his lessee. It had no interest in the contract with Ashburger, except that by force of circumstances it was deeply interested that Palmer should make his final payment and complete his title, since if his title failed, its lease would fall with it. Second, he was a partner occupying a fiduciary relation to the other members of the firm, and charged with the duty of good faith and fidelity to the interests of the partnership. Any wrongful disposition of partnership assets by him, in violation of this duty or in fraud of its rights, was liable to be set aside at the suit of his copartners, if the other parties to the transaction

had notice and knowledge that the property belonged
to the partnership.

We are of the opinion that under the facts plaintiffs
had the right to seek the aid of a court of equity to set
aside a conveyance made by a partner in violation of
his duty to the partnership, in so far as it affected its
rights adversely. In such an action the wrongful gran-
tees with notice are proper and necessary parties de-
fendant. The court in such a case has power to com-
pel restitution of the property or of its proceeds, and
may retain the action for the purpose of winding up
the affairs of the partnership, if it appears that this is
requested and should be done. A court of equity will
retain jurisdiction in order to do complete justice be-
tween the parties. *Bergeron v. Richardott,* 55 Wis. 129;
*Palmer v. Tyler,* 15 Gil. (Minn.) 81.

Defendants assert there is no proof that the opera-
tions of the partnership were interfered with by the
company, and that consequently no cause of action ac-
crued. There is no proof of force being used by the
company in the occupation of the south part of the lake
or of physical resistance by the plaintiffs. But, when
all the circumstances are considered, it seems obvious
that the taking of actual possession and the sinking of
over 400 wells by the company in the south part of the
lake would effectually interfere with the raising of capi-
tal by the partners and the successful prosecution of
their enterprise. As pointed out, this invasion took
place after this action was commenced. It is true that, if
let alone, the parties might have been forced to aban-
don their lease and thus lose all their rights; but,
as long as it was in existence, no one had the right to
interfere with them. Under its terms they had a right
to quiet enjoyment for at least a reasonable time, under
all the circumstances, to work out their enterprise, and
those who, knowing their rights, ventured to oust them,
other than by legal means, took the chance of having to

return a legal equivalent for whatever of value they were deprived of.

Defendants argue that, because Palmer only held an equitable interest in the land, he had no power to grant a lease to commit waste by the removal of mineral from the estate, and could not do so until after he acquired title. This might be a ground of complaint if made by the Ashburgers, the owners of the fee at that time; but, if they raised no such objection, we cannot see that any other party can complain.

In *Baker v. Hart,* 123 N. Y. 470, 12 L. R. A. 60, a lessee had the right to quarry stone on the demised lands for a period of ten years. It was held, in an action by the lessee to recover the value of stone quarried and taken by trespassers, that the plaintiffs had no title to the stone until quarried, and that, since it was not shown that during the term of the lease they would have exhausted all the stone, they had no right to recover. Other cases are cited to the same effect, and it is contended that plaintiffs have only a license, and and that, since they have not shown that the potash is exhausted, there can be no recovery. Even if only a license, it is shown that the lake was at one time pumped dry, and there is no evidence that there is any potash still remaining and susceptible of extraction. Furthermore, it is a matter of common knowledge that the chance of future profit from the reduction of potash from such waters is highly problematical after peace is declared with Germany and commerce is restored. The natural presumption under the facts shown is that the value of the deposit has been largely eliminated by defendants' operations.

But, as we have before stated, the partners held more than a mere license, and we are convinced that it was the intention that the partnership should have exclusive possession of the south end of the lake, with the right to extract all the potash therein or thereunder. It follows that for any interference with this possession,

with knowledge or notice, the lessee is' entitled either to
a return of the property removed or to compensation.
The doctrine of *Baker v. Hart, supra,* therefore, cannot
be applied.

We find it difficult to apply the principles relating to
oil leases to the facts in this case. It appears that the
distribution of potash in waters of the lake is by no
means uniform, presumably for the reason that evap-
oration proceeds as the waters move southward. The
natural drainage is toward the south or southeast, and
the water in the south end of the lake is much the
richer. Defendants first confined their operations to
that portion of the lake north of the dividing line. That
it was some time afterward before they invaded the
southern portion of the lake seems to have been oc-
casioned by this fact.

The question as to the proper measure of damages
has given us much trouble. First, the general rule is
that, where one having knowledge of the rights of an-
other wilfully trespasses' upon and takes his property,
the owner is entitled to follow and recover it, even
though its condition may have been changed and value
added by the wrongdoer. On the other hand, if the tak-
ing of the property has been under an honest mistake
of fact and with no wrongful intention on the part of
the trespasser, the owner is only entitled to recover its
value in its natural state. One of the leading cases on
this proposition is *Woodenware Co. v. United States,*
106 U. S. 432, 1 Sup. Ct. Rep. 398. This case has been
followed and cited many times. It states a principle
derived from the civil law. *Baker v. Meisch,* 29 Neb.
227. In Nebraska, however, a slight modification of
the rule has been adopted. In *Carpenter v. Lingen-
felter,* 42 Neb. 728, 737, it is pointed out that there is a
conflict of authority upon the matter: "There is one
line of cases which holds that, where the value of prop-
erty has been increased by another, the owner may re-
cover the value of the property in its improved and

more valuable form. There is another line of decisions which states the rule broadly that the measure of the recovery is the value of the article before the same was improved by the other's labor and skill, and this whether the value was increased by a wilful wrongdoer or by a person acting in good faith. The last rule seems to us the better one. It gives the owner full compensation, and to the other party the increase of value for his labor bestowed on the property. *Single v. Schneider,* 24 Wis. 299, 30 Wis. 570; *Hungerford v. Redford,* 29 Wis. 345; *Herdic v. Young,* 55 Pa. St. 176; Cobbey, Law of Replevin, sec. 913; *Wetherbee v. Green,* 22 Mich. 311.''

Plaintiffs rely upon *Guffey v. Smith,* 237 U. S. 101, 35 Sup. Ct. Rep. 526, holding in effect that, where a wrongdoer extracted oil from the leasehold of another and placed it in a pipe line, the lessee of the land from which the oil was extracted was entitled to a return of the value of the oil in the pipe line, without deduction for the cost and labor of sinking the wells and pumping the oil. Water containing potash in solution is not in a marketable form when pumped into a pipe line. Much the larger portion of the cost of what might be termed manufacturing the potash accrues thereafter. Large quantities of fuel must be consumed and expensive apparatus and machinery employed before potash in a marketable form is produced. If the partners had removed the water, they would have been compelled to incur like expenditures and change the nature of the product before a sale could be had. The condition, therefore, is the same as where material of comparatively small value has been taken and its nature or species has been changed, or its identity lost, by the process of manufacture. 1 C. J. 385, 386.

We feel compelled to adopt the rule in the *Carpenter* case, because we believe that the rule in that case is most in consonance with the principle, so often applied in this state, that damages should only be compensatory, and not include the element of punishment.

Clay v. Palmer.

Copsey, being the owner of the ranch, had full right to recover potash both from the small lake spoken of, from another lake known as the Wilson lake, and from all except the southern portion of Ashburger lake. It ·is shown that, when the latter lake was pumped dry, water containing potash in a more diluted state was pumped into it by defendants, evidently for the purpose of leaching the subsurface deposits through the wells already sunk.

We have been unable to ascertain from the evidence any definite, clear and satisfactory basis upon which the ascertainment of the sum of $120,000 as the damages suffered was founded. We believe that justice will be more nearly subserved by affirming the judgment of ·the district court, except as to the amount of recovery, reversing the judgment as to this, and remanding the case, with directions to ascertain and determine as near as possible the proportion of potash derived from the waters of that portion of the lake leased to the partners; to charge the defendant Copsey and the company with the net proceeds of all potash derived from the same, less the royalty of one-eighth, and the cost of extraction after the water was in the pipe line; and to award the sum remaining, after the debts of the partnership and expenses of a receiver have been paid, to the respective parties or their assigns, as their interests appear. The evidence already in the record upon the question of damages is· to be considered in connection with such other proof as may be produced by the parties, or either of them, upon this issue. At best, an amount only approximating the real damages can be ascertained; but we think other facts may be adduced which will aid the court, or a master, to more nearly fix the actual loss than the evidence now in the record.

Defendants, on the motion for a new trial, offered to show the net profits of their operations during the time they were reducing the water from Ashburger lake.

This inquiry is not relevant to the question at issue, and the offer was properly rejected.

AFFIRMED IN PART, AND REVERSED IN PART.

DEAN and FLANSBURG, JJ., not sitting.